# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **HAMILCAR BARCA IP LLC,** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **No. 1:25-CV-00620-RP** |
| | § | |
| **NVIDIA CORP.,** | § | |
| *Defendant* | § | |

## ORDER

The District Judge referred the *Markman*[1] hearing in this case to the undersigned. Dkt. 39. After considering the relevant law, the parties' briefing, and the arguments presented at the hearing, the Court will construe the claims according to the following discussion.

## I.    BACKGROUND

This patent-infringement suit arises from Defendant Nvidia Corp.'s ("Nvidia") allegedly unlawful use, sale, and offers to sell Plaintiff Hamilcar Barca IP LLC's ("Hamilcar") patented technology related to error feedback in a Serial Advanced Technology Attachment ("SATA") and switching security states in a computer processor. Dkt. 1. Hamilcar alleges infringement of two patents, which the Court describes below.

---

[1] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996) (holding that interpretation of a word in a patent is an issue of law to be decided by the judge).

### A.    The 8,086,938 ("'938") Patent

Computer interfaces need pre-defined protocols allowing components (i.e., the computer and a storage device) to communicate. '938 Patent, 1:23-25. Electromagnetic interference or "noise" can interfere with those communications. *Id.* at 2:24-37. At the time of the patent, companies were using SATA to organize communications into packets called Frame Information Structures ("FIS"). *Id.* at 1:20-26, 2:16-23. There are two different types of FIS: data and non-data. *Id.* at 2:19-23; 2:17-20. A data type contains data; a non-data type can include information like commands from the computer to the storage device. *Id.* at 2:17-23.

According to the '938 Patent, pre-invention SATA protocol provided that when a non-data FIS was received with an error, the receiving side would request that it be resent. *Id.* at 2:24-30. But when a data FIS was received with an error, the protocol did not require that the data FIS be resent. *Id.* at 2:29-34. This resulted in "abnormal" control commands being passed between the computer parts. *Id.* at 2:38-44.

The '938 patent aims to fix that problem. It detects errors in the transmission of a data FIS and, when such errors are detected, sets a "check bit" in the AT Attachment with Packet Interface ("ATAPI") status register. *Id.* at 4:53-64. This signals there is an error and allows other components to handle it. *See id.* at 4:53-5:8.

Independent claim 1 states,

A method for processing noise interference in a data accessing device with a SATA (Serial Advanced Technology Attachment) interface, the method comprising:

an error detecting step for detecting whether there is a CRC (Cyclic Redundancy Check) error, whether an reception error primitive

(R_ERR primitive) is received, whether an improper primitive is received, or whether a LINK layer error is detected, and repeating this step if there is no any error;

a type detecting step for detecting whether an FIS (Frame Information Structure) is a data type FIS;

a responding step for asserting the CHECK bit of the ATAPI Status Register when the FIS is data type; and

sending back the response.

'938 Patent, 6:39-49.

### B.    The 8,407,783 ("'783") Patent

Before the '783 Patent, computer processors could switch between two security states (high security and normal security), with each security state having its own dedicated hardware resources isolated from the other security state. *See* '783 Patent, 1:17-28. The '783 Patent purports to make this more efficient by sharing hardware resources. *Id.* at 1:45-56. Specifically, when a program requests access to hardware resources, the processor assigns a "user access right" to the request based on the system's security state and "protection level." *Id.* at 1:65-2:10. Because some hardware resources may be available in both security states, this increases utilization. *Id.* at 3:32-44. Requests made in the high-security state receive greater or equal access to hardware resources than requests made in the normal security state, so sensitive data are protected from potentially malicious software in the normal security state. *Id.*

Claim 3 of the '783 Patent discloses

The computing system as claimed in claim 2, wherein the processor core initializes the protection level register during a security booting

3

procedure of the computing system, and the processor core is in the security state during the security booting procedure.

'783 Patent, 7:12-16. Similarly, claim 12 discloses

The method as claimed in claim 11, wherein the protection level is initialized by the processor core during a security booting procedure of the computing system, and the processor core is in the security state during the security booting procedure.

*Id.* at 8:25-29.

The '783 Patent method claim (claim 11) states

A method of providing normal security and high security services with reduced amount of hardware resources, comprising:

providing hardware resources which are grouped into a plurality of resource security levels;

providing a processor core switched between different security states, the different security states including a normal security state for providing the normal security services and a high security state for providing the high security services;

assigning a user access right to a request in accordance with the security state of the processor core and a protection level of a computing system including the hardware resources and the processor core, wherein, in comparison with the normal security state, the user access right assigned in the high security state for a particular protection level of the computing system further allows the request to use the hardware resources of a higher resource security level, and, for a particular security state of the processor core, the user access right assigned for a lower protection level covers the user access right assigned for a higher protection level;

determining whether the request has the authority to use the hardware resources in accordance with the assigned user access right and the resource security levels of required hardware resources of the request;

executing the request when the request is determined to have the authority to use the hardware resources; and

4

responding the request with an exception when the request is determined to not have the authority to use the hardware resources.

'783 Patent, 7:61-8:25.

## II.   LEGAL STANDARDS

### A.   Claim Construction

"'[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In determining the meaning of the claims, courts first consider intrinsic evidence, including the claims themselves, the specification, and the prosecution history. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004). "The claim construction inquiry … begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). In analyzing the claim, a term's context, other asserted or unasserted claims, and differences among claim terms can be instructive. *Phillips*, 415 F.3d at 1314.

Claims should also be read "in view of the specification," which is "the single best guide to the meaning of a disputed term." *Id.* at 1313 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to

be ascertained from the words alone." *Teleflex, Inc. v. Ficosa N. Am. Grp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). "'[A]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323.

Additionally, though typically less useful, the prosecution history before the PTO provides "evidence of how the PTO and the inventor understood the patent" and can aid in claim construction. *Phillips*, 415 F.3d at 1317. Finally, extrinsic evidence— including dictionaries, treatises, and expert testimony—may be considered, but it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (quoting *C.R. Bard*, 388 F.3d at 862).

### B.    Ordinary Meaning

In general, courts should construe each claim term according to its ordinary and customary meaning as understood by a person of ordinary skill in the art[2] at the time of the invention. *Id.* at 1312-13. The "only two exceptions to [the] general rule" that claim terms are construed according to their ordinary meaning are (1) "when a patentee sets out a definition and acts as his own lexicographer," or (2) "when the

---

[2] Patents are interpreted from the perspective of a person of ordinary skill in the art, or POSITA. *See Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application.").

patentee disavows the full scope of the claim term either in the specification or during prosecution."[3] *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). "The standards for finding lexicography or disavowal are exacting." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014).

To act as his or her own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term" and "clearly express an intent to redefine the term." *Thorner*, 669 F.3d at 1365 (internal quotations omitted). The lexicography must appear with "reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow the full scope of a claim term, the patentee's statements in the specification or prosecution history must constitute a "clear and unmistakable" disclaimer. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 (characterizing disavowal as "expressions of manifest exclusion or restriction"). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

---

[3] Some courts characterize other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover only its corresponding structure. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

### C.      Step-Plus-Function Claiming

The statutory basis for step-plus-function claiming is 35 U.S.C. § 112(f),[4] which

states,

> An element in a claim for a combination may be expressed as a means or **step for** performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112(f) (emphasis added).[5]

"It is well established that this statutory provision can apply not only to a

combination of mechanical elements, but also to 'a combination of … steps in a process

claim.'" *Masco Corp. v. U.S.*, 303 F.3d 1316, 1326 (Fed. Cir. 2002) (quoting *O.I. Corp.

v. Tekmar Co.*, 115 F.3d 1576, 1582 (Fed. Cir. 1997)). Use of the term "steps for"

"signals the drafter's intent to invoke" section 112(f). *Id.* But "even where the drafter

---

[4] This is the same provision as 35 U.S.C. § 112 ¶ 6 as re-numbered in the America Invents Act.

[5] Hamilcar's objection to the application of section 112(f) to step-plus-function claiming is not well-taken. *See* Dkt. 38, at 16. Hamilcar's own case, *O.I. Corp. v. Tekmar Co., Inc.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997), explicitly allows it: "The statute thus in effect provides that an element in a combination method or process claim may be recited as a step for performing a specified function without the recital of acts in support of the function." And the Federal Circuit has confirmed that both types of functional claiming are part of the same body of law. *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1365 (Fed. Cir. 2022) ("Limitations that invoke [section 112(f)] are generally known as 'means-plus-function' or 'step-plus-function' limitations."); *see also Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002) ("[I]n the context of method claims, the use of the term 'steps for' signals the drafter's intent to invoke [section 112(f)]."); *SitePro, Inc. v. Waterbridge Res. LLC*, No. 6:23-CV-115-ADA-DTG, 2024 WL 760923, at *39-40 (W.D. Tex. Feb. 23, 2024) (applying section 112(f) to a limitation drafted in step-plus-function form). To the extent Hamilcar meant only to argue that section 112(f) does not apply here, *see* Dkt. 46, at 12, the Court's analysis proceeds below.

employs the 'step for' language," section 112(f) is implicated "'only when steps plus function *without acts* are present.'" *Id.* (quoting *O.I. Corp.*, 115 F.3d at 1582).

As a concept, means- or step-plus-function gives and takes away, permitting functional claim language but "restricting the scope of coverage to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015). Under section 112(f), "'the "underlying function" of a method claim element corresponds to *what* the element ultimately accomplishes in relationship to what the other elements of the claim and the claim as a whole accomplish. "Acts," on the other hand, correspond to *how* the function is accomplished.'" *Masco*, 303 F.3d at 1327 (quoting *Seal-Flex, Inc. v. Athletic Track & Ct. Constr.*, 172 F.3d 836, 849-50 (Fed. Cir. 1999) (Rader, J., concurring)).

The first step in the step-plus-function analysis is to determine whether section 112(f) applies. The phrase "step for" in a method claim raises a presumption that section 112(f) applies. *Seal-Flex*, 172 F.3d at 849 (Rader, J., concurring). But "[e]ven when a claim element uses language that generally falls under the step-plus-function format, [section 112(f)] still does not apply when the claim limitation itself recites sufficient acts for performing the specified function." *Id.* The presumption is overcome when the challenger shows, by a preponderance of the evidence, that a POSITA "would not have understood the [term] limitations to connote [here, *acts*] in light of the claim as a whole." *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1367 (Fed. Cir. 2022).

In the second step, after determining that step-plus-function applies, courts determine "'what [act], if any, disclosed in the specification corresponds to the claimed function.'" *Id.* at 1365 (quoting *Williamson*, 792 F.3d at 1351).

### D.    Definiteness

Patent claims must "particularly point[] out and distinctly claim[] the subject matter … regard[ed] as the invention." 35 U.S.C. § 112(b). A patent fails as indefinite under § 112(b) if a challenger shows by clear-and-convincing evidence that the claims, read in light of the intrinsic evidence, "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014); *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017). The claims, read in light of the specification and prosecution history, "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

### III.    CONSTRUCTION OF DISPUTED TERMS

### A.    The Court construes the error-detecting step term according to its plain and ordinary meaning.

This claim term reads "an error detecting step for detecting whether there is a CRC (Cyclic Redundancy Check) error, whether an reception error primitive (R_ERR primitive) is received, whether an improper primitive is received, or whether a LINK layer error is detected[.]" '938 Patent, 6:42-46. Nvidia argues the term invokes section

112(f) and is indefinite due to lack of corresponding "structure."[6] Dkt. 37, at 12.

Hamilcar argues that the term does not invoke section 112(f) and is not indefinite.

Dkt. 38, at 15-19. As explained below, while section 112(f) presumptively applies,

Hamilcar has rebutted the presumption. The Court will therefore assign the term its

plain and ordinary meaning.

Section 112(f) presumptively applies because the claim uses "step for"

language. '938 Patent, 6:42. Hamilcar says the term "detecting" as used in this claim

is like "passing" in *O.I. Corp.*, 115 F.3d at 1583, and "transmitting" in *Masco*, 303

F.3d at 1326-28. Dkt. 38, at 17. But in both of those cases—at least for the purpose of

determining whether the presumption applied—the court analyzed "steps of"

language. *See O.I. Corp.*, 115 F.3d at 1583 (considering the language "the step[s] of

… passing the analyte slug through a passage"); *Masco*, 303 F.3d at 1327 ("Neither

of these claims employs the 'step for' language that signals the drafter's intent to

invoke [section 112(f)]; rather, the claims employ the term 'steps of.' Thus there is no

presumption that these limitations are in step-plus-function format."). Because the

claim uses the words "step for," section 112(f) presumptively applies. *Seal-Flex*, 172

F.3d at 849 (Rader, J., concurring).

Hamilcar rebuts the presumption. The presumption is only overcome if the

claim recites sufficient acts for performing the specified function. *Id.* Nvidia argues

that the claim does not recite sufficient acts; rather, according to Nvidia, "the claim

---

[6] Nvidia uses the term "structure" in place of "acts" because it asserts "the case law typically uses 'structure' as the shorthand for the statutory language 'structure, material, or acts.'" Dkt. 37, at 11 n.2.

describes only the desired functional result—that the claimed 'error-detecting step' detects four types of errors (CRC error, R_ERR, improper primitive, and link layer error)—without any explanation of how the purported invention identifies these conditions." Dkt. 37, at 12. At the hearing, Nvidia explained that a POSITA would not read the claim as disclosing sufficient acts because there are different ways to conduct each enumerated test. Dkt. 51. Hamilcar disagrees, arguing that a POSITA with relevant knowledge of SATA would read the claim as a "specific recitation of a discrete act." Dkt. 38, at 17.

The Court finds the claim recites sufficient acts for performing the specified function. The invention receives a raw data FIS and analyzes it in order to determine whether there is an error. But the invention does not claim CRC, R_ERR, or LINK checks; those are acts that describe how the user accomplishes the function of detecting errors. *See Masco*, 303 F.3d at 1327 ("[T]he 'underlying function' of a method claim element corresponds to *what* the element ultimately accomplishes in relationship to what the other elements of the claim as a whole accomplish. 'Acts,' on the other hand, correspond to *how* the function is accomplished." (internal quotation marks omitted)).

The Court agrees with Hamilcar that a POSITA would understand how to check for the errors enumerated in the claim. *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1261 (Fed. Cir. 2017) ("[A] patent need not teach, and preferably omits, what is well known in the art." (internal quotation marks omitted)); *see also Alcatel USA Res. Inc. v. Microsoft Corp.*, No. 6:06 CV 500, 2008 WL 2625852, at *14 (E.D.

Tex. June 27, 2008) ("'[W]e have held that it is sufficient if the claim term is used …

by persons of skill in the pertinent art to designate structure, even if the term covers

a broad class of structures and even if the term identifies structures by their

function.'" (quoting *Mass. Inst. Tech. v. Abacus Software*, 462 F.3d 1344, 1356 (Fed.

Cir. 2006))). The "Cyclic Redundancy Check," "R_ERR primitive" and "LINK layer"

errors are standard errors that occur when transmitting a data FIS. *See, e.g.*, '938

Patent at 2:24-37.[7] Though, as Nvidia argues, different POSITAs may have different

ways of checking for those errors, the important part is that a POSITA would

understand how to do so. *Dyfan*, 28 F.4th at 1367. Because the claim recites sufficient

acts for performing the specified function, Hamilcar overcomes the presumption that

112(f) applies. *Seal-Flex*, 172 F.3d at 849 (Rader, J., concurring). The Court construes

the term according to its plain and ordinary meaning.

### B.   The Court construes the type-detecting step term according to its plain and ordinary meaning.

The Court gives this term its plain and ordinary meaning, as well. The claim

provides "a type detecting step for detecting whether an FIS (Frame Information

Structure) is a data type FIS[.]" '938 Patent, 6:48-49. Nvidia argues the term invokes

---

[7] *But see* Dkts. 37-2, at 48 (showing U.S. Patent No. 6,609,167 (Bastiani), which explains how to conduct a CRC check which is not the heart of what the invention claims); 37-3, at 14 (showing U.S. Patent No. 6,321,361 (Autechaud), same). While these patents show that more detailed claiming is possible, the Court finds Nvidia's reference to them unpersuasive given that a POSITA would understand how to conduct the checks. *Netgear, Inc. v. Ruckus Wireless, Inc.*, 5 F. Supp. 3d 592, 623 (D. Del. 2013), which Nvidia cites at Dkt. 37, at 13 n.3, is distinguishable. There, the court found that the term "error correction means" was indefinite because the specification failed to provide any detail on "the computation and application" of those checks. *Id.* But here, the claim names the checks to be conducted, which a POSITA would understand how to conduct.

section 112(f) and should be construed as checking whether the first byte has the value 46H. Dkt. 37, at 15-16. Hamilcar argues that the term does not invoke section 112(f) and should be given its plain and ordinary meaning. Dkt. 38, at 19-20.

The undersigned finds section 112(f) presumptively applies because this claim uses the words "step for." '938 Patent, 6:48; *Seal-Flex*, 172 F.3d at 849 (Rader, J., concurring). But Hamilcar again overcomes the presumption. The claim discloses the specific act of "detecting whether [an FIS] is a data type FIS." '938 Patent, 6:48-49; Dkt. 38, at 19. A POSITA with knowledge of SATA would understand how to detect whether an FIS is a data-type FIS. The Court construes the term according to its plain and ordinary meaning.

### C.  The Court construes the responding step term according to its plain and ordinary meaning.

The Court will likewise construe this term according to its plain and ordinary meaning. The patent claims "a responding step for asserting the CHECK bit of the ATAPI Status Register when the FIS is a data type[.]" '938 Patent, 6:50-51. Nvidia states section 112(f) presumptively applies because the patentee used "step for." Dkt. 37, at 17. According to Nvidia, Hamilcar can't rebut that presumption because the remainder of the claim "merely recites the result of the 'responding' function: 'asserting the CHECK bit of the ATAPI Status Register when the FIS is a data type.'" *Id.* Nvidia argues the claim fails to disclose any "operation, logic, or analysis to explain *how* the CHECK bit is asserted." *Id.* at 17-18. Hamilcar states section 112(f) does not apply because the claim discloses a supporting act that tells a POSITA how

the step is accomplished: "asserting the Check bit of the ATAPI Status Register when the FIS is data type." Dkt. 38, at 20-21.

As before, the Court agrees that section 112(f) presumptively applies because the drafter used the words "step for." '938 Patent, 6:50; *Seal-Flex*, 172 F.3d at 849 (Rader, J., concurring). The claim discloses a corresponding act, which is "asserting the CHECK bit of the ATAPI Status Register when the FIS is a data type." '938 Patent, 6:50-51. Hamilcar rebuts the presumption by showing that a POSITA would understand how to assert the check bit. The Court will assign the term its plain and ordinary meaning.

### D.    The Court finds the security state term is indefinite.

Nvidia argues the term is indefinite because the antecedent reference is unclear. Dkt. 37, at 19-22. Hamilcar argues Nvidia ignores the context in which the term appears, which indicates it is intended to refer to the high security state. Dkt. 38, at 12. The Court agrees with Nvidia and concludes this term is indefinite.

Use of the word "the" signals an antecedent reference. *Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1379 n.8 (Fed. Cir. 2020). Where there are multiple possible antecedents, a POSITA is "left to wonder which of the antecedents is the intended one." *Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*, 813 F. App'x 522, 526 (Fed. Cir. 2020). In determining whether a term is indefinite for lack of clear antecedent reference, courts consider the claim, its context, the specification, and the prosecution history. *See id.* at 526, 527 n.1.

15

Nvidia asserts a POSITA cannot determine the scope of claims 3 and 12 because the claim language reveals multiple plausible antecedent bases (specifically, in claims 1 and 11, on which claims 3 and 12 depend); the specification does not provide reasonable certainty that one of those antecedents is the only one intended; and the prosecution history confirms that ambiguity. Dkt. 37, at 20.

Hamilcar's response is that both claims add a "'security booting procedure'" and "'security booting'" refers only to a booting procedure "'while the processor core is in the high security state.'" Dkt. 38, at 12. Hamilcar adds that a POSITA would recognize that the term "the security state" is "shorthand" for the high security state. *Id.* at 14.

Nvidia is correct that claims 1 and 11 provide multiple antecedent bases for "security state." See Dkt. 37, at 20. Claim 1 states that the invention comprises "a processor core, switching between different security states including a normal security state for providing the normal security services and a high security state for providing the high security services[.]" '783 patent, 6:51-54. So the question is whether the specification provides the required certainty.

The dispute boils down to whether the patent discloses that the security booting procedure occurs only when the processor core is in the high-security state. True, the specification discloses *an* embodiment in which the security booting procedure occurs in the high-security state. '783 Patent, 4:21-29; *see* Dkt. 37, at 21 (citing *Thorner*, 669 F.3d at 1366). But "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only

16

embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004). While "security booting procedure" appears only three times in this patent (in this passage and in claims 3 and 12), the Court declines to read the specification as foreclosing the possibility that another embodiment may not require the system to be in the high security state for a security booting procedure to occur.

The Court is unpersuaded by Hamilcar's argument at the hearing that a POSITA would understand a security booting procedure occurs only in the high-security state given the patent's clear disclosure of only *an* embodiment. Dkt. 51; '783 Patent, 4:21-29; *see Thorner*, 669 F.3d at 1365 ("It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must clearly express an intent to redefine the term." (internal quotation marks omitted)). As written, the claim would leave a POSITA "to wonder which of the antecedents is the intended one." *Bushnell*, 813 F. App'x 522 at 526; *see also Liebel-Flarsheim*, 358 F.3d at 913 (declining to limit the scope of a term where defendant did "not point to any language in the specification that expresses an intention to limit the scope of the term" to a particular embodiment); *CardWare Inc. v. Google LLC*, No. 7:24-CV-278-DC-DTG, 2025 WL 3455951, at *13 (W.D. Tex. Aug. 25, 2025) (declining to rely on one disclosure in the specification as limiting the term to only an interpretation consistent with that disclosure).

17

Finally, prosecution history. Hamilcar does not disagree with Nvidia's reasoning that when the examiner considered the "security state" limitation in initially rejecting certain claim terms, he interpreted it to mean "the normal security state." *See* Dkts. 37, at 22; 38, at 13-14 (citing *Innova*, 381 F.3d at 1124 (concluding that the examiner's acquiescence to claim language chosen by the applicant showed no clear evidence of the patentee's disavowal of claim scope)). To the extent the later-withdrawn rejections are probative of the term's indefiniteness, the examiner's analysis weighs slightly in favor of concluding the term is indefinite.

For similar reasons, the Court declines to judicially correct the claims to state that "the processor core is in the *high* security state." *See* Dkt. 38, at 14 (requesting the Court add the word "high" in claims 3 and 12). "The standard for judicial correction is a demanding one." *Canatex Completion Sols., Inc. v. Wellmatics, LLC*, 159 F.4th 39, 46 (Fed. Cir. 2025). To show judicial correction is warranted, (1) the error must be evident from the face of the patent, i.e., "obvious, as determined from the point of view of one of skill in the art"; (2) the correction must not be subject to reasonable debate in view of the claim language and the specification; and (3) the prosecution history must not suggest a different interpretation of the claims. *Id.* (internal quotation marks omitted).[8]

Here, the error would not be clear to a POSITA on the face of the patent, and the proposed correction is subject to reasonable debate. *See id.* As discussed, the claim

---

[8] The Federal Circuit has not held, as Nvidia suggested at the hearing, that a district court may *only* correct obvious and minor typographical and clerical errors. *See* Dkt. 51; *Canatex*, 159 F.4th at 46 ("We have not stated that element as a necessary requirement, which it may well be, but we here assume that it is.").

language and specification suggest two different, reasonable readings of the term, especially given Hamilcar points to only an embodiment in support of its proposed reading. *See* '783 Patent, 4:21-29; *Thorner*, 669 F.3d at 1365. The Court may decline judicial correction on these bases alone. *See Canatex*, 159 F.4th at 46 (characterizing the elements as "necessary requirements"). Further, the prosecution history does not support a finding that Hamilcar's reading is the only possible interpretation of the claims. *See id.* The term is indefinite.

### E. The Court construes the preamble as partially limiting and partially non-limiting.

The preamble states "A method of providing normal security and high security services with reduced amount of hardware resources." '783 Patent, 7:62-63. The Court finds the phrase "normal security and high security services" is limiting, but that the preamble is otherwise not limiting.

According to Nvidia, the preamble introduces the terms "normal security" services and "high security" services, which are then used in the steps of claim 11. Dkt. 37, at 25. Because the preamble therefore creates a "direct link" between itself and the claim as a whole, it is required to be limiting. *Id.* at 24-25 (citing *Sanofi Mature IP v. Mylan Lab'ys Ltd.*, 757 F. App'x 988, 993 (Fed. Cir. 2019); *Digit. Retail Apps, Inc. v. H-E-B, LP*, No. 6:19-CV-00167-ADA, 2020 WL 376664, at *8 (W.D. Tex. Jan. 23, 2020); *RECOG IP LLC v. Sephora USA, Inc.*, No. 6:23-CV-00324-ADA-DTG, 2024 WL 1252373, at *2 (W.D. Tex. Mar. 22, 2024)).

Hamilcar emphasizes that preamble language is generally not considered limiting and only limits the invention "'if it recites essential structure or steps, or if

19

it is necessary to give life, meaning, and vitality to the claim.'" Dkt. 38, at 8 (quoting *Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*, 958 F.3d 1348, 1354 (Fed. Cir. 2020)). Hamilcar states that this is not the case with claim 11's preamble and that the method of claim 11 is "set forth completely in the body of the claim." *Id.* Hamilcar further argues that just because the claim references normal and high security services does not mean the preamble provided essential steps, since the invention "is not about the services themselves, which are simply standard services." *Id.* at 9.

"Courts presume that the preamble does not limit the claims." *Digit. Retail*, 2020 WL 376664, at *7 (citing *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010)). But "'[i]n general, a preamble limits the invention if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim.'" *Cochlear*, 958 F.3d at 1354 (quoting *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed Cir. 2002)). "[D]ependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention." *Catalina*, 289 F.3d at 808. In contrast, "'preamble language merely extolling benefits or features of the claimed invention does not limit the claim scope without clear reliance on those benefits or features as patentably significant.'" *Id.* (quoting *Catalina*, 289 F.3d at 809). "[A] preamble is not limiting where the patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Id.* (internal quotation marks omitted).

"The Federal Circuit has provided some 'guideposts' regarding whether the preamble is limiting: (1) preamble provides antecedent basis, (2) preamble is essential to understand limitations or terms in the claim body, (3) preamble recites 'additional structure or steps underscored as important by the specification,' and (4) 'clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art.'" *Digit. Retail*, 2020 WL 376664, at \*7 (quoting *Catalina*, 289 F.3d at 808-09).

As the parties agreed at the hearing, Dkt. 51, the preamble phrase "normal security and high security services" supplies the antecedent basis for "the normal security services" and "the high security services." '783 Patent, 8:2-5. It is therefore limiting. *See Rapoport v. Dement*, 254 F.3d 1053, 1059 (Fed Cir. 2001) (concluding, as the parties agreed, that the preamble was limiting based on antecedent basis alone); *cf. Cochlear*, 958 F.3d at 1355 (concluding the preamble was not limiting in part because it did not provide an antecedent basis for the body of the claims).

But the phrase "with reduced amount of hardware resources" denotes only a benefit or use of the invention. *See Cochlear*, 958 F.3d at 1354. It does not describe how the normal-security and high-security services are provided. *See In re Xencor, Inc.*, 130 F.4th 1350, 1358-59 (Fed. Cir. 2025). Further, "'[a] preamble is not regarded as limiting … when the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention.'" *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 24 (Fed. Cir. 2015) (quoting *Am. Med.*, 618 F.3d at 1358-59). Deletion of "with reduced amount of

hardware resources"—unlike deletion of "normal security and high security services"—does not affect the structure or steps of the invention. *See id.*

Therefore, the Court finds the phrase "normal security and high security services" is limiting, but that the preamble is otherwise not limiting. Because the Court finds "normal security and high security services" is limiting, it must construe the term. *Digit. Retail*, 2020 WL 376664, at *9. Since the Court discerns no evidence of lexicography or disavowal, and in the absence of any argument from Nvidia regarding a different construction of the phrase,[9] the Court will construe "normal security and high security services" according to its plain and ordinary meaning. *See Thorner*, 669 F.3d at 1365.

## IV.    CONSTRUCTION OF AGREED TERMS

The Court will construe the agreed terms according to the parties' proposal as outlined below.

## V.    ORDER

In accordance with the foregoing discussion, the Court construes the terms at issue as follows:

| Claim Term | Court's Construction |
|---|---|
| "there is no any error" ('938 Patent, claim 1) | "there is not any error" |
| "responds the request" ('783 Patent, claim 1) | "responds to the request" |
| "responding the request" ('783 Patent, claim 11) | "responding to the request" |

---

[9] In the hearing, Nvidia stated it agreed with the Court's construction of this term and otherwise rested on its briefing. Dkt. 51.

| Disputed Term | Hamilcar's Proposed Construction | Nvidia's Proposed Construction | Court's Construction |
|---|---|---|---|
| "an error detecting step for detecting whether there is a CRC (Cyclic Redundancy Check) error, whether an reception error primitive (R_ERR primitive) is received, whether an improper primitive is received, or whether a LINK layer error is detected"<br><br>('938 Patent, claim 1) | Plain and ordinary meaning | This term is step-plus-function governed by 35 U.S.C. § 112(f), and is indefinite | Plain and ordinary meaning |
| "a type detecting step for detecting whether an FIS (Frame Information Structure) is a data type FIS"<br><br>('938 Patent, claim 1) | Plain and ordinary meaning | Step-plus-function<br><u>Function</u>: "detecting whether an FIS (Frame Information Structure) is a data type FIS"<br><u>Structure</u>: check whether the first byte (Byte 0) of the FIS has the value 46H as described in the '938 patent, 3:65-4:2 & fig.3 (showing Byte 0 as "FIS Type") | Plain and ordinary meaning |
| "a responding step for asserting the CHECK bit of the ATAPI Status Register when the FIS is a data type" | Plain and ordinary meaning | Step-plus-function<br><u>Function</u>: "asserting the CHECK bit of the ATAPI Status | Plain and ordinary meaning |

| | | | |
|---|---|---|---|
| ('938 Patent, claim 1) | | Register when the FIS is a data type" <u>Structure</u>: set the check bit of the ATAPI status register to the value 1 as described in the '938 patent, 4:55-61 & fig.8 | |
| "the processor core is in the security state" <br><br> ('783 Patent, claims 3 and 12) | the processor core is in the <u>high</u> security state | Indefinite | Indefinite |
| "A method of providing normal security and high security services with reduced amount of hardware resources" <br><br> ('783 Patent, claim 11) | Not limiting | Limiting and indefinite | Limiting only as to "normal security and high security services" <br><br> "normal security and high security services" is construed according to its plain and ordinary meaning <br><br> "reduced amount of hardware resources" is not limiting |

**SIGNED** April 30, 2026.

DUSTIN M. HOWELL
UNITED STATES MAGISTRATE JUDGE